# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**OSCAR CHAPMAN,**

    **Plaintiff,**

v.                                  CIVIL ACTION NO. 2:20-CV-725

**DR. CHARLES LYE,**
**WEXFORD MEDICAL,**
**CAPTAIN BRIAN PENICK,**
**OFFICER DAVID EWING,**
**SERGEANT JESSE SMITH,**
**OFFICER CHARLES JOHNSON,**
**OFFICER CHARLES MOLES,**
**LIEUTENANT CHRIS WILSON, &**
**OFFICER RUSSELL PARKER, JR.,**

    **Defendants.**

## **FIRST AMENDED COMPLAINT**

1. This case arises out of the abuse of an inmate in the sole custody, care, and control of Defendants, who are each employed by or contracted with the West Virginia Department of Corrections and Rehabilitation (DCR). While an inmate at Mount Olive Correctional Complex (MOCC), Mr. Chapman, who was recovering from brain surgery, was beaten without cause, unreasonably subjected to chemical agents, and the reoccurrence of his brain tumor went undiagnosed, leading to a second, invasive brain surgery, for which Mr. Chapman has subsequently denied necessary physical therapy to assist his recovery. As a result of Defendants' constitutional violations, Mr. Chapman has suffered pain and injury, and is currently in danger of being permanently disabled.

2. Plaintiff submits this complaint pursuant to 42 U.S.C. § 1983, alleging that his rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated by Defendants when they (1) condoned or committed excessive and wrongful force

1

against Plaintiff during two incidents on October 25, 2018, and (2) have been deliberately indifferent to Plaintiff's serious medicals needs after his second brain surgery.

## PARTIES

3. Plaintiff Oscar Chapman is and was, at all relevant times herein, a citizen of the United States in the custody of the West Virginia DCR. Plaintiff suffers from brain tumors and is currently mostly unable to walk without the assistance of another person or a walker, and is sometimes confined to a wheelchair.

4. Defendant Charles Lye, MD, was at all relevant times, an employee of Wexford Health Sources, Inc., and the medical doctor assigned to treat patients at Mount Olive Correctional Complex. In that capacity, Defendant Lye was, and remains, responsible for Plaintiff's medical care while Plaintiff is an inmate at Mount Olive Correctional Complex.

5. Defendant Wexford Health Sources, Inc. (Wexford) is a national corporation that provides medical services to correctional facilities, with its principal place of business at 501 Holiday Drive, Foster Plaza Four, Pittsburgh, PA 15220. At all relevant times, Wexford was the medical provider contracted by the DCR to provide medical services to inmates housed in DCR facilities including Mount Olive Correctional Complex.

6. Defendant Brian Penick was, at all relevant times, a correctional officer employed at the rank of Captain at Mount Olive Correctional Complex. At all times alleged here, Defendant Penick was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Penick is sued in his individual capacity for monetary damages.

7. Defendant David Ewing was, at all relevant times, a correctional officer employed at the rank of Correctional Officer 2 at Mount Oliver Correctional Complex. At all times alleged here, Defendant Ewing was acting under color of law and within the apparent scope of his

employment as a correctional officer. Defendant Ewing is sued in his individual capacity for monetary damages.

8. Defendant Jesse Smith was, at all relevant times, a correctional officer employed at the rank of Sergeant at Mount Olive Correctional Complex. At all times alleged here, Defendant Smith was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Smith is sued in his individual capacity for monetary damages.

9. Defendant Charles Johnson was, at all relevant times, a correctional officer employed at the rank of Correctional Officer 1 at Mount Olive Correctional Complex. At all times alleged here, Defendant Johnson was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Johnson is sued in his individual capacity for monetary damages.

10. Defendant Charles Moles was, at all relevant times, a correctional officer employed at the rank of Correctional Officer 2 at Mount Olive Correctional Complex. At all times alleged here, Defendant Mole was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Mole is sued in his individual capacity for monetary damages.

11. Defendant Chris Wilson was, at all relevant times, a correctional officer employed at the rank of Lieutenant at Mount Olive Correctional Complex. At all times alleged here, Defendant Wilson was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Wilson is sued in his individual capacity for monetary damages.

12. Defendant Russell Parker, Jr. was, at all relevant times, a correctional officer employed at the rank of Correctional Officer 2 at Mount Olive Correctional Complex. At all times

alleged here, Defendant Parker was acting under color of law and within the apparent scope of his employment as a correctional officer. Defendant Parker is sued in his individual capacity for monetary damages.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the federal claims presented in this action pursuant to 28 U.S.C. §§ 1331, 1343 and under the Court's authority to decide pendent state law claims. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201-2202.

14. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the events that support the allegations occurred in this judicial district.

## FACTUAL BACKGROUND

15. On February 2, 2018, Mr. Chapman was convicted of several crimes by a jury in Marion County. Those convictions were later reversed by the West Virginia Supreme Court.

16. On March 7, 2018, while in custody at Western Regional Jail, Mr. Chapman was taken to Cabell Huntington Hospital for neurosurgery to remove a brain tumor.

17. On or around June 28, 2018, Mr. Chapman was transferred to the custody of Mount Olive Correctional Complex, where Defendants Lye and Wexford became responsible for his medical care.

**Correctional Officers Assault Mr. Chapman for No Reason**

18. On or about October 25, 2018, Mr. Chapman was removed from his placement in general population and transported to the segregation unit at MOCC.

19. Mr. Chapman had written a poem for a female friend, and had asked a female correctional officer to read the poem and provide feedback. The correctional officer reported that Mr. Chapman was attempting to "compromise" her as an officer, a violation of prison rules.

20. Mr. Chapman was transported into the segregation, or security wing, of MOCC, and placed in a holding cell while waiting to be examined in the Medical Unit, a routine step before being put in segregation.

21. Without directing Mr. Chapman to cuff up or otherwise providing a direct order to Mr. Chapman, the Correctional Officer Defendants convened an extraction team to remove Mr. Chapman from the cell.

22. The extraction team, in which correctional officers wear protective gear, including helmets, and carry weapons and shields, consisted of Defendants David Ewing, Jesse Smith, Charles Johnson, Charles Moles, Chris Wilson, with Brian Penick supervising. Derek McKinney, who is not named as a defendant, operated a video camera during the cell extraction.

23. As the extraction team got ready, Mr. Chapman repeatedly asked to speak with an officer, but all of the officers refused to come over to speak with him. Mr. Chapman even asked specifically to speak with Defendant Smith, but Defendant Smith refused his request.

24. Instead, rather than engaging Mr. Chapman in de-escalation techniques, the extraction team approached Mr. Chapman's cell yelling "don't resist" to Mr. Chapman. They gave Mr. Chapman no instructions about where he should be in his cell, how he should position his body, or how else he could comply.

25. Because Mr. Chapman knew they were about to enter his cell, he put his hands above his head, hoping that this action of surrender would deter the extraction team from using violence against him.

26. McKinney, who was running the video camera for the extraction team stayed out in the hallway and never entered Mr. Chapman's cell, obscuring the video recording of what happened inside Mr. Chapman's cell.

27. Although Mr. Chapman was standing with his hands above his head, ready to comply with any orders he was given, the extraction team barged into Mr. Chapman's cell without giving him *any* commands about what he could do to affirmatively comply, and violently took him to the ground, without provocation.

28. Once Mr. Chapman was on the ground, facedown, the officers in the extraction team kicked and hit him for no justifiable reason.

29. Mr. Chapman lay on the ground facedown as he was being attacked by the officers in the extraction team. At no time did he attempt to fight back against the officers.

30. On the video of the cell extraction, Mr. Chapman can be heard desperately telling the officers that he has a brain tumor.

31. During the beating, the Officers injured Mr. Chapman's finger, head, and broke his glasses.

32. The officers then handcuffed Mr. Chapman and shackled his feet, and walked Mr. Chapman, who remained totally compliant, to the medical unit for assessment.

33. During this entire time, Mr. Chapman remained compliant and obeyed any order the officers gave him.

34. In the aftermath of this beating, Mr. Chapman experienced pain, dizziness, blurred vision, and at times he had trouble standing.

35. Upon information and belief, and in clear violation of DCR policy, only one officer involved in this use of force wrote a report. Specifically, Defendant Penick wrote an Incident Report about Mr. Chapman's extraction, but provided *no* details of what happened or the basis for using the extraction team, another clear violation of DCR policy. Instead, he merely wrote that

"entry was initiated. I/M Oscar Chapman #3548901 was placed in mechanical restraints and escorted to Medical Room One."

**Correctional Officers Spray Mr. Chapman with OC Spray for No Reason**

36. Later the same day, after being placed in a solitary confinement cell in the segregation unit, Mr. Chapman started to feel dizzy, and was continuing to have blurred vision. In light of his recent brain surgery, Mr. Chapman was scared that the beating had caused further injury.

37. He yelled out to Defendant Russell Parker, a correctional officer who was nearby, that he needed help because he was feeling dizzy but Defendant Parker ignored Mr. Chapman.

38. Feeling scared that he was about to pass out, Mr. Chapman attempted to get Defendant Parker's attention by kicking his cell door from the inside.

39. Without saying anything to Mr. Chapman, Defendant Parker walked over to Mr. Chapman's cell door, opened the food tray slot, and sprayed Oleoresin Capsicum (OC) spray into Mr. Chapman's cell.

40. At no time did Defendant Parker ask Mr. Chapman what was wrong, respond to Mr. Chapman's calls for help, or direct Mr. Chapman to stop kicking the cell door.

41. As a result of being sprayed, Plaintiff, who has asthma, felt as though he could not breathe and his eyes and skin burned.

42. On information and belief, Plaintiff's asthma was known by Wexford and DCR.

**Mr. Chapman's brain tumor grows back**

43. On or about February 27, 2019, Defendant Lye noted in Mr. Chapman's medical records that Mr. Chapman needed a surveillance MRI every 3-6 months for the five years following his March 2018 brain surgery.

7

44. In April 2019, following several seizures, Mr. Chapman had a surveillance MRI. That MRI found no enhancing mass lesions, but did find postsurgical changes to Mr. Chapman's brain including encephalomalacia, or softening/loss of brain tissue, which can be due to trauma or injury.[1]

45. On August 1, 2019, Mr. Chapman had a seizure, which he reported to medical staff.

46. On August 2, 2019, Mr. Chapman was unable to speak for a period of time, which he reported to medical staff.

47. On August 15, 2019, CNA Kelly Hilderbrand put a note in Mr. Chapman's file to "follow up with doctor on seizure activity and chronic care." Defendant Lye reviewed this note.

48. Nevertheless, neither Defendants Lye nor Wexford provided Mr. Chapman with any further follow-up care for his brain tumor until April 2020, a full year after his prior MRI.

49. On April 17, 2020, Mr. Chapman received an MRI at Montgomery General Hospital. Dr. Patrick Hill at Montgomery General reviewed the results, but found nothing abnormal. Dr. Hill, however, noted that he did not have any prior MRIs to compare the current MRI with, and he recommended comparing the April 2020 MRI with any available past MRIs.

50. Upon information and belief, Dr. Lye and Wexford Health had past MRIs of Mr. Chapman's brain available, but did not provide them to Dr. Hill for comparison.

51. Dr. Lye reviewed the MRI results from Dr. Hill, and noted "no new finding" in Mr. Chapman's records. There is no indication that Dr. Lye compared the results to Mr. Chapman's

---

[1] Emin Karaman, et al., *Encephalomalacia in the Frontal Lobe: Complication of the Endoscopic Sinus Surgery*, The Journal of Craniofacial Surgery, Vol. 22 Issue 6, 2374-75 (Nov. 2011), https://journals.lww.com/jcraniofacialsurgery/Abstract/2011/11000/Encephalomalacia_in_the_Frontal_Lobe__Complication.95.aspx#:~:text=Encephalomalacia%20is%20the%20softening%20or,of%20brain%20tissue%20after%20infarction ("Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury.").

prior MRIs to look for changes between them, or followed up with Dr. Hill to have such comparison completed.

52. On information and belief, the failure to provide Mr. Chapman's comparison MRIs to Dr. Hill is a direct result of Defendant Wexford Medical's policy or custom of failing to ensure continuity of care for incarcerated people who are referred for care from outside providers. This policy or custom directly and/or proximately caused Mr. Chapman's injuries here.

53. Around the same time, in April 2020, the West Virginia Supreme Court of Appeals overturned Mr. Chapman's criminal conviction, and on June 2, 2020, Mr. Chapman was transferred back to the regional jails as a pretrial detainee.

54. On June 20, 2020, Mr. Chapman reported having another seizure and informed medical staff at the regional jail that he was having seizures more often than usual.

55. On July 8, 2020, Mr. Chapman reiterated that his seizures were getting worse and he wanted to be seen by a doctor.

56. In August 2020, Dr. Andrea Huffman, a doctor in the regional jail system, noted that Mr. Chapman needed another surveillance MRI to monitor his brain tumor.

57. On September 14, 2020, Mr. Chapman was taken to United Hospital Center in Clarksburg, West Virginia for a surveillance MRI.

58. The results of that MRI were sent to the neurosurgery department at Ruby Memorial Hospital in Morgantown, West Virginia. Upon receipt, the neurosurgery department immediately called the jail to say that Mr. Chapman's tumor had grown *significantly* and that he needed to be seen in the neurosurgery clinic "*ASAP*." Mr. Chapman was sent to see his neurosurgeon, Dr. Bhatia, at Ruby Memorial Hospital in Morgantown, West Virginia, that very same day.

59. Dr. Bhatia concluded that Mr. Chapman needed another brain surgery and that Mr. Chapman should be seen by a medical oncologist.

60. Mr. Chapman was prescribed a cancer drug to take in advance of surgery in an attempt to shrink his tumor as much as possible before surgery. He had a follow-up MRI at the WVU Health Science Center on October 20, 2020.

61. On November 16, 2020, Dr. Bhatia performed Mr. Chapman's second brain surgery.

62. Since that surgery, Mr. Chapman has suffered from severely slurred speech and is mostly unable to walk without assistance, relying heavily on a wheelchair or walker.

**Plaintiff Transferred Back to MOCC and Denied Physical Therapy**

63. On or around December 15, 2020, after Mr. Chapman's second brain surgery, he was released from Ruby Memorial back to the custody of North Central Regional Jail.

64. On December 18, 2020, Mr. Chapman was transferred from North Central Regional Jail back to MOCC, ostensibly because MOCC would be better equipped than North Central to offer Mr. Chapman the post-operative care he needed.

65. In his post-operative instructions, Dr. Bhatia ordered that Mr. Chapman receive "home health physical therapy" to regain full use of his legs. Upon information and belief, the medical records containing these instructions were delivered to Defendants Lye and Wexford at MOCC.

66. However, since being placed back under the care of Defendants Lye and Wexford, Mr. Chapman has received only *two* physical therapy appointments in the five months since he has been at MOCC after his second brain surgery: once when he first arrived at MOCC following his

second surgery, and once after Mr. Chapman's follow-up appointment with Dr. Bhatia in March 2021.

67. Mr. Chapman has repeatedly asked for physical therapy appointments and has repeatedly been told that he should just use exercise bands in his cell to exercise his legs in lieu of actual physical therapy. While Mr. Chapman was initially allowed to keep exercise bands in his cell, he now only can access them for a limited amount of time each day and cannot keep them in his cell.

68. Mr. Chapman had a follow-up appointment with Dr. Bhatia on or around March 16, 2021. Dr. Bhatia was furious to learn that Mr. Chapman had received only one physical therapy appointment since his transfer back to MOCC. Dr. Bhatia once again ordered that Mr. Chapman receive regular physical therapy appointments to aid him in regaining the ability to walk confidently without assistance.

69. Mr. Chapman has thereafter continued to request physical therapy from Defendants Lye and Wexford, but they continue to refuse to provide it to him.

70. Without proper physical therapy, Mr. Chapman has not recovered the full use of his legs. He continues to regularly rely on a walker and wheelchair. Otherwise, he is only able to shuffle short distances with his cellmate next to him, in case Mr. Chapman starts to fall.

71. Defendants Lye and Wexford's ongoing refusal to secure physical therapy for Mr. Chapman constitutes deliberate indifference to Mr. Chapman's serious medical needs—namely, his need for physical therapy in order to regain the full use of his legs. This deliberate indifference has resulted in harm to Mr. Chapman as he continues to struggle with mobility and is unable to walk without a walker or someone spotting him to prevent him from falling.

72. On information and belief, failure and refusing to provide Mr. Chapman with appropriate physical therapy is another example of Defendant Wexford Medical's policy or custom of failing to ensure continuity of care for incarcerated people under its care who also receive care from outside providers. This policy or custom directly caused or contributed to Mr. Chapman's injuries here.

**Damages**

73. As a result of the Correctional Officer Defendants' physical assaults, Plaintiff suffered from a contusion to his head, swelling to his finger, and pain from both the beating during the cell extraction and the unjustified use of OC spray later that same day, and continues to suffer from anxiety, stress, and fear of further uses of force.

74. As a result of Defendants Lye and Wexford's conduct, Plaintiff's brain tumor grew substantially without treatment, Plaintiff suffered multiple seizures and loss of vision, Plaintiff underwent a highly invasive second brain surgery which has left him unable to ambulate independently. In addition, Plaintiff's speech is extremely slurred and difficult to understand, interfering with his ability to communicate with others. Mr. Chapman also continues to suffer ongoing pain, anxiety, and stress relating to his conditions.

**COUNT I**
**VIOLATIONS OF THE UNITED STATES CONSTITUTION**
**EXCESSIVE FORCE**
**(42 U.S.C. § 1983)**

2. Plaintiff incorporates the preceding paragraphs by reference.

3. The Correctional Officer Defendants, while acting under the color of law, violated Mr. Chapman's Eighth Amendment right to be free from cruel and unusual punishment, resulting in pain and suffering.

4. Defendants Penick, Ewing, Smith, Johnson, Moles, Wilson, and Parker violated Mr. Chapman's federal constitutional rights, as described and identified here, by authorizing, committing, condoning, or failing to remedy the excessive and wrongful force, employed against Plaintiff on or about October 25, 2018.

5. The actions of said Defendants against Plaintiff were in violation of clearly established law.

6. The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment through the use of force that is unnecessary, unjustified, or applied with malicious and sadistic intent for the purpose of punishment and to cause harm.

7. On October 25, 2018, correctional officers had a "firmly established duty to ensure that legitimate instruments of control were not misused." *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).

8. On October 25, 2018, it was clearly established that physically assaulting an incarcerated person without justification, including by kicking and hitting that person, constitutes excessive force in violation of the Eighth Amendment to the United States Constitution. *See Hudson v. McMillian*, 503 U.S. 1 (1992).

9. Defendants Penick, Ewing, Smith, Johnson, Moles, and Wilson, violated the Eighth Amendment by using nontrivial physical force, in the form of physical assaults including kicking and hitting Plaintiff, without need or to cause pain.

10. On October 25, 2018, it was also clear that the use of mace, tear gas, or other chemical agents "in quantities greater than necessary or for the sole purpose of infliction of pain" violated the Eighth Amendment of the United States Constitution. *See Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008).

11. Defendant Parker violated the Eighth Amendment by using nontrivial physical force, in the form of OC pepper spray, against Plaintiff, without need or to cause pain.

12. As a direct or proximate result of the Defendants' unconstitutional actions, Plaintiff endured physical pain and suffering, injuries, mental pain and suffering, humiliation, embarrassment, and degradation.

13. Defendants' actions were committed under the color of state law, and were unreasonable, deliberate, and deprived Plaintiff of clearly established constitutional rights of which reasonable prison officials should have known pursuant to the Eighth Amendment to the United States Constitution.

14. The actions or inactions of said Defendants against Mr. Chapman were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Plaintiff, thereby justifying an award of punitive damages.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter an order awarding the following damages and relief:

(a) Physical pain and suffering, past and future;

(b) Mental pain and suffering, past and future;

(c) Humiliation, embarrassment, and degradation;

(d) Punitive damages;

(e) Attorney's fees and costs, pursuant to 42 U.S.C. § 1988; and

(f) All other damages allowed by law.

### COUNT II
### VIOLATIONS OF THE UNITED STATES CONSTITUTION
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED
### (42 U.S.C. § 1983)

15. Plaintiff incorporates the preceding paragraphs by reference.

16. Defendants Lye and Wexford, while acting under the color of law, violated Mr. Chapman's Eighth Amendment right to be free from cruel and unusual punishment, and Fourteenth Amendment due process rights, by acting with deliberate indifference to his serious medical needs.

17. These failures to provide Mr. Chapman's constitutionally guaranteed health care are also a direct result of Wexford Medical's policy or custom of failing to ensure continuity of care for incarcerated people under its care who also receive care from outside providers.

18. Defendants violated Mr. Chapman's federal constitutional rights, as described and identified here, by authorizing, committing, condoning, or failing to remedy the deliberate indifference to Plaintiff's serious medical needs during his multiple incarcerations at Mount Olive Correctional Complex.

19. Specifically, as stated herein, while Mr. Chapman was at Mount Olive Correctional Complex, Defendants Lye and Wexford failed and refused to refer him for regular surveillance MRIs of his brain tumor between May 2019 and April 2020, and, when finally referring him for a surveillance MRI, did not provide the necessary medical records needed to compare the images of his brain. As a result, when Mr. Chapman's brain tumor was not discovered until September 2020, by which point it was at a very serious stage. Mr. Chapman underwent drug therapy and a second, invasive brain surgery, which resulted in his current difficulties talking and walking.

20. While Mr. Chapman has been at Mount Olive Correctional Complex following his second brain surgery, Defendants Lye and Wexford have failed and refused to provide him with the physical therapy he needs to regain the full ability to walk on his own, thereby forcing Mr. Chapman to rely on a walker and wheelchair, and preventing him from engaging in his normal daily life.

21. The actions of the Defendants were in violation of clearly established law.

22. The Eighth Amendment to the United States Constitution forbids cruel and unusual punishment through deliberate indifference to an incarcerated person's serious medical needs.

23. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits conditions that amount to punishment and therefore deprive a pretrial detainee of his liberty without due process of law, including deliberate indifference to an incarcerated person's serious medical needs.

24. During the time period at issue, it was clearly established that deliberate indifference to a serious medical need of a convicted incarcerated person violates the Eighth Amendment of the United States Constitution and deliberate indifference to a serious medical need of a pretrial detainee violates the Fourteenth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 (1977)).

25. In May 2019, it was clearly established that a failure to follow the advice of a specialist may constitute deliberate indifference to a serious medical need. *See Jones v. Simek*, 193 F.3d 485, 490-91 (7th Cir.1999). It was also clearly established that a delay in treatment that results in actual harm to an incarcerated person may constitute deliberate indifference to a serious medical need. *See Formica v. Aylor*, 739 F. App'x 745, 758 (4th Cir. 2018).

26. In December 2020, it was clearly established that refusing to provide an incarcerated person with necessary physical therapy may constitute deliberate indifference to a serious medical need. *See LaFaut v. Smith*, 834 F.2d 389, 394 (4th Cir. 1987).

27. Defendants have violated the Fourteenth and Eighth Amendments and continue to violate the Eighth Amendment by refusing to provide Mr. Chapman with the physical therapy he needs to regain his ability to walk.

28. As a direct or proximate result of the Defendants' unconstitutional actions, Plaintiff has endured physical pain and suffering, permanent or long-term injuries, mental pain and suffering, humiliation, embarrassment, and degradation.

29. Defendants' actions were committed under the color of state law, and were unreasonable, deliberate, and deprived Plaintiff of clearly established constitutional rights of which reasonable prison medical providers should have known pursuant to the Eighth and Fourteenth Amendments to the United States Constitution.

30. The actions or inactions of Defendants against Mr. Chapman were reprehensible, willful and wanton, malicious, and in blatant and intentional disregard of the rights owed to Plaintiff, thereby justifying an award of punitive damages.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter an order awarding the following damages and relief:

(a) Physical pain and suffering, past and future;

(b) Mental pain and suffering, past and future;

(c) Humiliation, embarrassment, and degradation;

(d) Punitive damages;

(e) Attorney's fees and costs, pursuant to 42 U.S.C. § 1988; and

(f) Any other equitable relief that this Court deems appropriate.

## COUNT III
## ASSAULT AND BATTERY

119. Plaintiff incorporates the proceeding paragraphs by reference.

120. Defendants Penick, Ewing, Smith, Johnson, Moles, Wilson, and Parker intentionally battered Plaintiff as described above.

121. As a direct result of being battered, Plaintiff suffered injuries.

122. Defendants are liable for their inappropriate conduct resulting in battery of the Plaintiff.

123. Defendants used the force maliciously and sadistically for the purpose of inflicting pain; Plaintiff is therefore entitled to compensatory damages as well as punitive damages.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter an order awarding the following damages and relief:

(a) Appropriate equitable relief;

(b) Actual and punitive damages;

(c) Reasonable attorney's fees and the cost of this litigation; and

(d) Such other relief the Court deems equitable and just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

**OSCAR CHAPMAN**
**By Counsel,**

/s/ Lydia C. Milnes
Lydia C. Milnes (WVSB #10598)
Mountain State Justice, Inc.
1029 University Ave., Suite 101
Morgantown, WV 26505
(304) 326-0188
(304) 326-0189 (facsimile)
*lydia@msjlaw.org*